VERNIER et al. v. KNAUTH et al.

(Supreme Court, Appellate Division, First Department.  June 12, 1896.)

1. PRINCIPAL AND AGENT—NEGLECT OF DUTY—LIABILITY.

In an action against a customhouse broker, whom plaintiff had employed to attend to the entry of plaintiff's goods at the customhouse, for failure to perform such duties, whereby plaintiff's goods were entered the day after arrival, in consequence of which they were subject to a largely increased duty under a new statute, it appeared that defendants had been advised of the expected arrival of the goods, and that the new tariff bill was then before congress, and expected to go into effect in a few days. Shortly afterwards the act was approved, to take effect on the following Monday.  On Saturday morning the ship carrying plaintiff's goods had not been sighted, though it was overdue.  About noon on Saturday the collector, at the request of a large number of customhouse brokers, telegraphed the secretary of the treasury, asking permission to keep the customhouse open during the whole of that day, instead of closing at 3 o'clock, as was customary.  No public announcement had been made of this fact, but it was generally known to a great many persons who had collected in the corridors and lobbies of the customhouse.  Defendants' head clerk testified that he went to the customhouse at 3 o'clock, and inquired of a deputy clerk whether the customhouse would be kept open, and saw that the window where entries were usually made was closed; and that thereupon he went away, and reported that no entries could be made that afternoon.  Permission was received from the secretary of the treasury to keep the customhouse open; and business, if it was suspended at all, was immediately resumed.  Defendants closed their office at 3 o'clock, and made no further attempt to enter plaintiff's goods, which arrived at 6 o'clock in the afternoon.  Other goods arriving on the same ship were entered at the customhouse that night.  Held, that a finding that defendants were negligent was sustained by the evidence.

2. SAME—MEASURE OF DAMAGES.

Plaintiff's measure of damages in such case is the difference between the amount of the duties which he paid and the amount which he would have been required to pay had the goods been entered on Saturday.

3. NEW TRIAL—NEWLY-DISCOVERED EVIDENCE.

A motion for a new trial on the ground of newly-discovered evidence will not be postponed to await the result of an appeal from the judgment.

Appeal from judgment on report of referee.

Action by Maurice Vernier and another against Percival Knauth and others to recover damages for failure of defendants to enter plaintiffs' goods at the customhouse on the day of their arrival at the port.  From judgment entered in favor of plaintiffs, and from an order denying a motion for a new trial, defendants appeal. Judgment affirmed; order reversed.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS, PATTERSON, and INGRAHAM, JJ.

Antonio Knauth, for appellants.

F. R. Coudert, for respondents.

RUMSEY, J.  The plaintiffs are engaged in importing into this country for sale raw materials to be used in the manufacture of woolen fabrics, and the defendants are customhouse brokers, who, for some years prior to October, 1890, had been employed by the plaintiffs to attend to the entering and passing of the plaintiffs' goods through the customhouse at this port, and the advance and

payment for plaintiffs' account of all moneys necessary to pay the duties on such merchandise.    In the month of September, 1890, the plaintiffs had caused to be shipped to this port upon the steamer St. Regulus a large amount of the goods in which they dealt.    At the time the shipment was made it was understood that there was pending in congress a bill, the effect of which would be largely to increase the duties to be paid upon goods of the kind which the plaintiffs had shipped.    It was expected that this bill would take effect on the 1st day of October, 1890, and the plaintiffs hoped that the St. Regulus would reach this port in time so that the goods might be entered at the customhouse and passed and the duties paid under the existing act.    If that could have been done, it is conceded that the amount of duties to be paid by the plaintiffs would have been something over $6,800 less than if the goods arrived after the new act took effect and the duties were paid thereunder.    About the 26th of September, 1890, the plaintiffs' agent advised the defendants of the expected arrival of the St. Regulus, and requested them to attend to the entry of the goods and the payment of the duties.    It was known to the parties at that time that the new act was likely to take effect about the 1st of October, and the necessity that the goods should pass through the customhouse before the new act took effect was thoroughly well understood. Contrary to the expectations of all the parties, however, the act did not take effect on the 1st day of October, but it was signed shortly after that date under such circumstances that it was to take effect on the morning of the 6th of October, 1890.    That day was Monday, and consequently the last day for entering the goods at the customhouse under the old rate of duties would be Saturday, October 4th.    On the morning of the 4th of October the St. Regulus had not been reported, and the precise time of her arrival was uncertain, although, as she was four or five days overdue, it was expected that she might be sighted at any moment.    On that morning the plaintiffs' agent went to the defendants' office, and there had a conversation with Mr. Bormann, who was in charge of the business of the defendants, with regard to the possibility of entering the goods of the plaintiffs which were to arrive on the St. Regulus before the new customs tariff took effect.    It was understood that the regular hours of business at the customhouse ended at 3 o'clock in the afternoon, and that in the ordinary course of business no entries could be made after that time; so that, under ordinary circumstances, if a ship arrived after that time, no entries could be made on that day, nor until the next day when the customhouse was open for business, which in this case would have been on Monday, and after the new tariff took effect.    The plaintiffs' agent testified that, as they were discussing the possibility of entering the goods under the old act, he suggested to Bormann whether, it being the last day of the old tariff, the customhouse would not be open later than usual, to which Bormann said, "No;" not to rely upon that.    Bormann, the defendants' agent, did not deny this conversation, but he did say that he was not requested to make any special efforts, or any other efforts, to make this entry than

those which were usual. It is undeniable from the testimony that all parties appreciated the necessity of making this entry on Saturday, if possible, and that Bormann understood that he was expected to do it if it could be done. It is a conceded fact that, while the customhouse ordinarily closed in the month of October at 3 o'clock in the afternoon, yet at the request of a large number of customhouse brokers the collector, about noon of Saturday, had telegraphed to the secretary of the treasury, asking permission to keep the customhouse open for the entry of goods during the whole of that day, in view of the fact that the new tariff took effect on Monday, and that Sunday was not a business day. When the regular hour for closing the customhouse arrived, no answer to this telegram had been received. It is not denied that at that time there was great excitement among the customhouse brokers upon the subject of the entry of goods and the payment of duties under the old tariff; that it was generally known throughout the lobbies and corridors of the customhouse that permission had been asked from Washington to receive entries after the regular hour for closing, and that the corridors and lobbies were filled with a large crowd of excited men, who were generally discussing this subject, and waiting for the arrival from Washington of the answer to the collector's request. While no public announcement was made of the fact that such permission had been asked for, and an answer to the request was momentarily expected, yet it is very clear that such fact was generally understood among the men who were congregated there waiting for the opportunity to enter their goods. It is testified upon the part of the defendants that at various times from 12 o'clock until 3 inquiries were made of certain persons at the customhouse who were said to be deputy collectors, but who were not named, as to whether any unusual facilities would be extended for the entry of goods after the regular hour for closing. Of whom those inquiries were made does not appear, but it is said by the defendants' witnesses who testified to making the inquiries that the answer in each case was that it was not known that any such facilities could be afforded. The head clerk of the defendants testified that he went to the customhouse at 3 o'clock; that he made some such inquiries of a person who was a deputy collector, but who was not produced; that he saw the window where entries were usually made closed, and that thereupon he went away, and reported that no entries could be made that afternoon. The defendants' office was then closed, and all further efforts to enter the goods that day ceased. As a matter of fact, whether the regular entry window was closed at 3 o'clock or not, permission almost immediately came from Washington by telegram that the customhouse might be kept open during all of Saturday for the purpose of receiving entries, and thereupon business, if it had been suspended, was resumed, and continued until 12 o'clock that night. The St. Regulus was sighted early in the afternoon, and reached her dock about 6 o'clock, and her manifest was filed between 6 and 7 o'clock, and a large amount of goods which arrived by her were entered and passed at the customhouse that night. The plaintiffs'

goods were not passed, because the defendants had closed their office at 3 o'clock; and the goods were not entered until Monday, when the new tariff had taken effect. As the result, the plaintiffs became liable to pay duties to the amount of $6,861.17 more than they would have been compelled to pay if the goods had been entered on Saturday. The plaintiffs claim that this loss which they were put to was due entirely to the negligence of the defendants, and such was found by the referee to be the case, and accordingly he directed a judgment to be entered for the plaintiffs for the enhanced amount of duties and the interest thereon.

When the defendants undertook to attend to the entry and passing of these goods and the payment of the duties, they agreed to use all reasonable efforts to accomplish the thing which they were employed to do. That thing was something more than the mere ordinary entering and passing of goods and the payment of duties. It was to cause those goods to be entered, and the duties to be paid, before the new act took effect, if it could be done by the exercise of reasonable care. All parties recognized the fact that the situation was an unusual one, and that to avoid a considerable loss through the payment of enhanced duties it was necessary to be diligent to enter the goods before the new law took effect. Such was the situation with which the defendants were confronted. Ordinarily, of course, when they were employed to make an entry of goods, it was sufficient if they did what was usual in the performance of that duty, and they would not be called upon to attend to the business at any other hours than those during which the offices were opened for that purpose. Under ordinary circumstances, if they attended at the customhouse during the usual hours, and for any reason they were unable to enter the goods at those times, it is quite clear that they would not be chargeable with negligence. But the term "negligence" is a relative one, and whether or not it exists is to be decided by the situation of affairs at the time the defendant is required to act. The degree of diligence which any contractor is called upon to exercise is proportionate to the duty imposed, and the existence of negligence depends upon the failure to exercise the degree of diligence which the peculiar conditions require. Whether, in any given case, a party has been guilty of negligence, necessarily depends, then, upon what is required of him in the particular case, and it is a trite saying that what would be due diligence in one case might, under other conditions, with regard to the same kind of business, be serious negligence. In this particular case all persons understood that it was not sufficient simply to endeavor to enter the goods at the customhouse during the usual hours, but it was necessary, in order to save the plaintiffs from loss, that, if possible, they should be entered on the 4th day of October. That was the thing which the defendants undertook to do, and they were bound to bring to the doing of that thing the exercise of ordinary and usual care, such as they would have exercised in doing it for themselves. If they had any reason to believe that the customhouse would be open at other than the usual hours for the entry of goods on that day, no one would deny that it would be their duty to attend, so long as there was

a reasonable opportunity to enter the goods, and thereby avoid the payment of the enhanced duties.    They say that they had no knowledge that any such extension of the hours was contemplated by the customs officials, and it is quite likely that may be the fact.    But they were bound, not only to attend at such hours, but to use reasonable diligence to ascertain whether any such unusual facilities would be afforded.    Their attention had been called to it by the plaintiffs' agent.    They were well aware of the necessity of entering the goods, and it would seem from the testimony of their own agent as to the number of inquiries that he made with regard to the affording of unusual facilities that he had some reason to believe that such might be extended.    Whether or not he had any reason to believe that such facilities would be given if he had ascertained that they were to be given, there would be no doubt that he would be guilty of negligence in failing to avail himself of those facilities.    So he was also bound to use reasonable care to ascertain whether it was likely that such facilities would be afforded, because, if by the use of such care he might have ascertained that the customhouse would be kept open, he clearly failed in his duty to his principal if he did not make the ordinary and usual efforts to get that information.    The referee has found that by the exercise of ordinary care this fact could have been ascertained, and we think his finding is clearly warranted by the evidence.    It appears from the testimony that, while no public announcement was made of the fact that the authorities at Washington had been requested to permit the customhouse to be kept open, yet it was generally known among a great number of people who were congregated there for the express purpose of finding whether that would be done.    It seems hardly possible that the chief clerk of the defendants, who says that he was at the customhouse at 3 o'clock, could have gone among the large number of men who were there, and whom he does not deny were there, without ascertaining that something of that kind was expected; thus putting him upon inquiry as to what was likely respecting the possibility of entering those goods that afternoon.    It must stand as a settled fact in the case that the defendants would have ascertained, if they had made inquiries, that the customhouse was to be kept open during the whole of Saturday, to enable entries to be made of goods that arrived on that day.    The neglect to ascertain that thing, which they might have learned, was the direct cause of their failure to pay the duties under the old act, and of the necessity which arose that the duties should be paid under the new act.    We are quite clear, therefore, that upon this state of facts a finding of negligence was proper, and the report of the referee was correct.

It is said, however, that the judgment is erroneous, in that the amount of damages is too large.    The defendants' counsel concedes that no such question was raised upon the trial.    It was proved that these goods were imported for sale, and there is no presumption that it was the intention of the parties to take them out of bond, and re-export them, without payment of duties.    On the contrary, the presumption is all the other way.    At the time of the trial of the action the goods were still in this country, and the plaintiffs were

liable for the payment of the duties, as was conceded upon the trial. Upon that state of facts there can be no doubt that the rule of damages adopted by the referee was a proper one, and that the judgment was correct on that point.

It appears that after the appeal had been taken in this case a motion was made by the defendants for a new trial upon the ground of newly-discovered evidence. This motion was denied by the learned judge before whom it was made, without prejudice, however, to the right to renew the motion after the appeal from this judgment had been decided by this court. The action of the court in denying that motion upon that ground we think was erroneous. It is the policy of the law that motions for a new trial upon the ground of newly-discovered evidence, like all other motions for that relief addressed to the special term, shall be made promptly and without delay. When they are so made and decided, if a new trial is granted, it avoids the expense and delay of an appeal; and for that reason, in all cases when such a motion is made, it should be decided by the court to whom it is addressed, except, perhaps, in extraordinary instances. Ordinarily, there can be no doubt that a motion of that kind should not be postponed to await the result of an appeal which has been taken, but not argued. To be sure, the decision of motions of that kind is very largely in the discretion of the court before whom they are made. But the court has not a discretion whether or not to hear the motion. The party has an absolute right to make it if he is guilty of no laches; and if he gets into court with his motion it is the duty of the court to hear it as much as it is the duty to hear any other matter presented to it. The very fact that the party may be turned out of court because he is guity of laches in bringing on his motion affords an additional reason why it should be heard by the special term when the party brings it on for hearing.

The judgment entered upon the report of the referee should be affirmed, with costs to the plaintiffs, and the order denying the motion for a new trial should be reversed, and the motion sent back to the special term for hearing, with costs to the defendants to abide the result of the final hearing of the motion. All concur.