terests of their clients usually unfold legal papers served upon them, and it never has been considered necessary either to serve them unfolded or to open them in the presence of the adverse attorney. The title of the court and the title of the action both plainly and fully appeared upon the papers served. It is true that the notice did not recite that the judgment was entered in the office of the clerk of the City Court; but reference to the City Court appeared on the cover, and the notice states that the judgment was entered "in New York county." As there is but one City Court in New York county, it is difficult to see how the defendants' counsel has been misled, or that the notice is insufficient. Baker v. Hatfield, 3 Civ. Proc. R. 303; Harnett v. Wescott, 14 Civ. Proc. R. 360. The circumstances are materially different from those in the case of Tudor v. Ebner, 109 App. Div. 521, 96 N. Y. Supp. 392, and we are led to the conclusion that the notice of entry of the judgment was sufficient to limit the defendants' time in which to comply with the terms of the judgment, and that upon their failure to do so the final judgment was properly entered. The order denying the motion to vacate the final judgment must therefore be affirmed.

The order granting a retaxation of costs need not be reviewed upon this appeal, for the reason that, inasmuch as the final judgment was entered upon the default of the defendant and no appeal can be taken therefrom, if this court should reverse the order of retaxation, the judgment, not being before the court, could not be corrected, and the defendants would still be compelled to modify the judgment. Upon the motion for the retaxation of costs in the court below, the defendants only objected to the item of $15. Upon a review of such taxation only the items objected to before the taxing officer can be called in question. Section 3265, Code Civ. Proc.; La Rosa v. Wilner (decided at the present term of this court) 104 N. Y. Supp. 952. If, however, as claimed by the defendants, the entire bill of costs is illegal, a motion to correct and modify the judgment by striking out all the costs would be proper.

Appeals from the final judgment and from the order retaxing costs dismissed. Order denying motion to vacate final judgment affirmed, with costs and disbursements. All concur.

---

(54 Misc. 508)

JAMES McCREERY REALTY CORPORATION v. EQUITABLE NAT. BANK OF NEW YORK.

(Supreme Court, Appellate Term. May 28, 1907.)

1. NEW TRIAL—NEWLY DISCOVERED EVIDENCE—MOTION—AFFIDAVIT OF WITNESS.

    The unwillingness of a witness to make an affidavit, and the fact that he is out of the jurisdiction of the court, constituted a sufficient excuse for petitioner's failure to produce the affidavit in support of a motion for a new trial for newly discovered evidence.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, § 307.]

2. WITNESSES—CREDIBILITY—OFFENSES—CONVICTION.

    On an application for a new trial for newly discovered evidence, the fact that one of the witnesses by whom the evidence was expected to be

proved had been convicted of overcertification of checks while cashier of defendant bank, for which offense no sentence had been imposed, did not stamp witness as an offender whose testimony was unworthy of credit.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 109–118.]

3. NEW TRIAL—NEWLY DISCOVERED EVIDENCE—SUFFICIENCY AND PROBABLE EFFECT.

Where, in an action against a national bank on a lease, the bank successfully defended on the ground that the lease was executed before the bank was authorized to begin business by the Comptroller, newly discovered evidence that the lease was not in fact delivered until after such date *held* sufficient to justify the granting of a new trial.

4. SAME—CUMULATIVE EVIDENCE.

The fact that newly discovered evidence for which a new trial was asked was cumulative was no ground for denying the motion, if the evidence was of such a character that it would be likely to produce a different result.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, §§ 218–220.]

5. SAME—DILIGENCE—REQUEST FOR POSTPONEMENT.

Where, in an action on a lease against a national bank, plaintiff's attorney at the trial did not know he could procure any evidence to show that the lease was not delivered until after the bank was authorized to commence business by the Comptroller, it was not incumbent on him to plead surprise at defendant's evidence that the lease was executed and delivered before the bank was authorized to do business, and ask for a postponement to procure rebutting evidence, in order to entitle him to move for a new trial for newly discovered evidence; he having made diligent efforts to obtain proof on such point before the trial, and failed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, §§ 210–214.]

6. SAME—TIME OF APPLICATION—FURTHER APPEAL.

Where a judgment, after having been affirmed by the Appellate Term, was carried to the Supreme Court of the United States, and it did not appear that a decision by the latter court was made until after a motion for a new trial for newly discovered evidence was submitted·to the trial court, such motion should be treated as having been made pending the proceedings in the United States Supreme Court, rather than after the determination thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, §§ 238–245.]

7. SAME—JURISDICTION—STATUTES.

Code Civ. Proc. § 1002, declares that a motion for a new trial in the first instance must be heard and decided at Special Term before the same judge who tried the case, unless such judge is dead, or his term of office has expired, or he is disqualified or specially directs the motion to be heard before another judge, etc. Section 1005 declares that the entry of final judgment and subsequent proceedings to collect or enforce it are not stayed by an exception, the preparation or settlement of a case, or motion for a new trial, unless an order for such stay is procured and served; that the entry, collection, or other enforcement of a judgment does not prejudice a subsequent motion for a new trial; and that, where a new trial is granted, the court may direct and enforce restitution as where a judgment is reversed on appeal. *Held*, that such sections were applicable to the New York City Court, and authorized that court to grant a new trial for newly discovered evidence pending a writ of error from the Supreme Court of the United States.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, § 237.]

Erlanger, J., dissenting.

Appeal from City Court of New York, Special Term.

Action by the James McCreery Realty Corporation against the Equitable National Bank of New York. From an order of the New York City Court (102 N. Y. Supp. 975), granting plaintiff's motion for a new trial because of newly discovered evidence, defendant appeals. Affirmed.

Argued before GILDERSLEEVE, P. J., and GIEGERICH and ERLANGER, JJ.

Charles A. Hess and Jerome S. Hess, for appellant.

Eugene G. Kremer (William M. Ivins and Henry F. Wolff, of counsel), for respondent.

GIEGERICH, J. The action was brought to recover an installment of rent claimed to be due for the month of January, 1905, under a lease by which the plaintiff let to the defendant the premises No. 803 Broadway, in the borough of Manhattan, in which the latter carried on its banking business. The term of the lease was five years from May 1, 1902, and the yearly rental was $9,000, payable in monthly installments of $750. The respondent calls attention to the fact that it is not alone the amount of $750 sued for that is involved, but also the right to collect the subsequently accruing rent for the balance of the term, amounting to over $20,000.

A few days before the action was tried, an amended answer was served, which for the first time set up the defense that the defendant was not authorized by the Comptroller of the Currency to commence the business of banking until the 2d day of June, 1902, and that the lease set forth in the complaint was made and executed by the plaintiff with certain persons purporting to act on behalf of the defendant before the date of the latter's organization, and before it had any corporate existence, and before it had any right to commence the business of banking, and that such lease was consequently void. Upon becoming apprised of this defense, the plaintiff's attorney made inquiry to ascertain when the lease was executed and delivered, and was informed that it was delivered on the 19th day of June, 1902, as appeared by the plaintiff's records. Upon the trial the defendant's attorney testified that the lease was signed on May 27th, and on the same date was handed to John W. Wooten, to be delivered to the plaintiff. Wooten testified that he was at the time of the transaction the attorney for the defendant, and that he delivered the lease to one Easter, who represented the plaintiff company. Wooten did not profess to recollect the date when the lease was executed, or when he delivered it; but it was fairly to be inferred from his testimony that such date was May 27, 1902. That the bank was not authorized to commence the regular transaction of business until June 2, 1902, is undisputed.

At the close of the case each side moved for the direction of a verdict, whereupon the court, by consent of both parties, discharged the jury and reserved its decision on the motions, and subsequently rendered a decision in the form of findings of fact and conclusions of

law in favor of the defendant, finding, among other things, that the lease in question was entered into between the plaintiff and the defendant on the 27th day of May, 1902, and was delivered to and accepted and retained by the plaintiff on that date, and also finding that the defendant was not authorized to commence business until the 2d day of June, 1902. Judgment was accordingly directed and entered in favor of the defendant. An appeal was taken to this court, where the judgment was affirmed by an order dated May 26, 1905. On July 19, 1905, the case was carried by a writ of error to the Supreme Court of the United States, where it was pending at the time this motion for a new trial was made in the City Court on the 23d day of October, 1906.

From the moving papers it appeared that in September, 1906, the plaintiff's attorney for the first time learned of certain additional evidence that the lease was not signed by the defendant, nor delivered to the plaintiff, prior to June 2, 1902, but subsequent to that date. This information he first obtained from one Gandy, who stated to him that one Carraway, formerly cashier of the defendant, but now residing in the state of Mississippi, had informed him (Gandy) that the lease had been signed and delivered after June 2, 1902, and not before. The plaintiff's attorney endeavored to obtain an affidavit from Carraway, and communicated with him by telegraph; but Carraway refused to voluntarily make an affidavit. After receiving the above information the plaintiff's attorney also caused inquiry to be made of John W. Wooten, who made an affidavit that, after careful consideration of the facts, he now recalls that it was after June 2d that he handed the lease to Mr. Easter, the plaintiff's employé, and not before that date, as might be inferred from his testimony given at the trial. In Gandy's affidavit he states that Carraway told him that he (Carraway) was positive that the lease was not signed by him until after June 2, 1902, and that he is positive of the fact because he was well acquainted with the provision of law forbidding national banks to commence business until authorized by the Comptroller of the Currency to do so, and, further, he remembered delaying the execution of the lease because he desired to obtain the account of the plaintiff, and delayed signing the lease for that reason also.

The testimony above outlined is manifestly of such a character that it would, in all probability, turn the scale in the plaintiff's favor in the event of a second trial, because it must be borne in mind that the only evidence as to the time when the lease was delivered was that of the witness Wooten, who testified, not to a positive date, but to an event, the date of which was fixed by other witnesses, and who, furthermore, now claims to recall the fact that such delivery was made by him after June 2, 1902. The fact that the affidavit of the proposed witness Carraway is not presented is not, as the appellant argues, fatal to this application. It appears that, although Carraway was willing to tell Gandy the facts, he was, nevertheless, unwilling to furnish an affidavit for use upon the motion. This unwillingness of the witness to make an affidavit, and the fact that he is out of the jurisdiction of the court, constituted a sufficient excuse for the failure to produce his affidavit upon the motion. The rule is not an absolute one that the

affidavit of the proposed witness must be furnished upon a motion for a new trial.  It is enough if it is shown that such affidavit cannot be obtained.  Cheever v. Scottish Union & Nat. Ins. Co. of Edinburgh, 86 App. Div. 331, 83 N. Y. Supp. 732, affirmed 180 N. Y. 551, 73 N. E. 1121; Matter of Cohen, 84 Hun, 586, 32 N. Y. Supp. 851, and authorities there cited.

Some of the inferences sought to be drawn against the plaintiff's case are rebutted by other facts, which should be taken in connection therewith.  The proposed witness Easter was in court at the trial, it is true, and he was connected with the plaintiff, and was not called as a witness.  But the usual inference that his testimony would have been adverse to the plaintiff cannot obtain, because it is shown that upon the trial, and immediately after the defendant's evidence was put in, he was asked by the plaintiff's attorney what he knew as to the date of the delivery of the lease, and replied that he could give no information and had no recollection.  In his affidavit on this motion he states that recently, after conversing with O'Neale about his efforts to get the lease in June, his memory was refreshed, and he was able to state positively that the lease was not handed to him prior to June 2d, and that he will so testify at the trial.  So, too, with reference to the memorandum book, mentioned by the plaintiff's witness McCreery, but not produced.  No inference unfavorable to the plaintiff should be drawn from the fact of such nonproduction.  The witness stated on the trial that he had not brought the book, because he supposed his own testimony was to be taken on the point.  No effort was made to suppress or withhold that evidence however, because, some time after the trial, when the plaintiff moved to amend its complaint, it also moved to reopen the case for the purpose of placing in evidence the entry in the book mentioned.  As to the testimony of this witness that he had physical custody of the lease from some time in May, he states in his affidavit, used on this motion, that the reference he made in his testimony to copies of the lease was not to signed copies, but to drafts which had been prepared and submitted between the parties.

With respect to the alterations appearing in the photographic copy of the acknowledgment of the lease produced by the plaintiff, conceding that such alterations were of the kind claimed, viz., a change from May 27th to June 27th, I am unable to perceive in this fact any corroboration of the testimony that the lease was executed and delivered on the former date.  The acknowledgment referred to is in the form of an affidavit made by Andrew B. McCreery, as secretary of the plaintiff corporation; the date of the jurat being June 27th.  There is no alteration whatever in the jurat, and its accuracy is not questioned. It must therefore be accepted and established that the acknowledgment by the plaintiff company was made on June 27th.  In passing, it might be mentioned that the other acknowledgment of the same instrument, made by John Carraway, as cashier of the defendant bank, and as subscribing witness to the execution of the lease by the bank through its president, is dated June 19th, and the jurat, by the same notary, Thomas W. Folsom, who also took the affidavit of Andrew B. McCreery, just referred to, is dated June 19th.  The lease itself, in its body, is dated May 1st.

From these circumstances, my mind receives no light on the real question in issue, which is: When was the lease signed by the defendant bank and delivered to the plaintiff? Considering the lease alone, apart from any testimony, if any inference at all is to be drawn, it would appear that the defendant bank signed and acknowledged the lease on June 19th, and the plaintiff company signed and acknowledged it on June 27th, and that the date, May 27th, if it ever appeared in the instrument at all, was inserted in anticipation of an act expected to be done on that day, but apparently not in reality done until a later time. But it is unnecessary to inquire what significance that date might have had, because no such date ever appeared in the acknowledgment. An inspection of the photographic copy shows that the word "twentieth" was changed to "twenty" and the word "seventh" added, thus changing the date from the "twentieth day of May," as it originally stood, to the "twenty-seventh day of June," as it afterward stood. How, when, and why these alterations, with others, were made, are matters that might well be, and ought to be, explained upon a new trial.

Reference is made in the appellant's brief to the character of Wooten and Carraway; the former being now in state's prison, and the latter having been convicted of certifying checks in violation of the banking laws. It is with the character of the latter that we are chiefly concerned upon this motion, because it is in his testimony chiefly that the ground for a new trial is found. He was the cashier of the defendant bank, and apparently as such made the certificate referred to. The view of his offense taken by the federal judge before whom he pleaded guilty is indicated by the fact that no sentence was imposed. It was a matter commented upon as one of common knowledge at the time of his trial and conviction that the offense of overcertification of checks in anticipation of deposits to be made later in the day was a frequent one among cashiers, and many defended the practice on the ground that it was necessary to the conduct of business. At any rate, the offense was not of such a character as to stamp the offender as one whose testimony is unworthy of credit. It is true that on such a motion as this the character of the proposed witnesses is to be taken into account (Hagen v. New York Central & Hudson River R. R., 100 App. Div. 218, 91 N. Y. Supp. 914); but it is only one of the many things to be considered. Some of the differences between that case and this show the desirability of a new trial in this instance. There the case had been tried five times, and had been five times before a jury. Every opportunity had been afforded, again and again, to produce all the evidence and have it passed upon by a jury. In this case the jury was discharged without passing upon any of the issues; the evidence being so meager and of such a character that the question was treated by both sides as one of law. It is manifest that upon a new trial there will be many questions of fact presented on very conflicting testimony, on which the verdict of a jury should be had. As was said in Barrett v. Third Avenue R. R. Co., 45 N. Y. 628, 632:

"Motions to set aside verdicts as contrary to evidence, as well as motions for a new trial upon the ground of newly discovered evidence, are not governed by any well-defined rules, but depend in a great degree upon the peculiar

circumstances of each case.    They are addressed to the sound discretion of the court, and whether they should be granted or refused involves the inquiry whether substantial justice has been done; the court having in view solely the attainment of that end."

Upon such applications, it is possible always to cite many authorities on either side of the proposition, owing to the similarity of special features.    But all the circumstances of each case must be taken into consideration in disposing of each case as it arises, and, so doing in this instance, I am of the opinion that the ends of justice will be promoted by a new trial.    The fact that the newly discovered evidence was cumulative is not a ground, under the more recent authorities, for denying the motion.    As stated by Judge Van Brunt in Keister v. Rankin, 34 App. Div. 288, 291, 54 N. Y. Supp. 274, 275:

"The rule to be applied to newly discovered evidence, whether cumulative or not, is: 'Is it of such a character that it is likely to produce a different result upon a new trial?'"

See, also, Vollkommer v. Nassau Electric R. R. Co., 23 App. Div. 88, 48 N. Y. Supp. 372, and Hess v. Sloane, 47 App. Div. 585, 62 N. Y. Supp. 666.

The newly discovered evidence in this case in my judgment meets the requirement thus laid down.    Neither do I think that it was incumbent upon the plaintiff's attorney to plead surprise and ask for a postponement in order to procure his evidence.    At the time of the trial he did not know that he could procure any evidence on the point.    He had made diligent efforts to do so before the trial, and had failed.

Another proposition urged by the appellant is that, where a litigant has sought the United States Supreme Court and submits his cause to its jurisdiction, he must be bound by its judgment, which is conclusive as to all matters litigated therein, and inferior courts are precluded from interfering with the judgment in any manner whatsoever, and can do nothing except to carry into execution its mandate. In the first place, it should be observed that this is not a motion made after judgment of the Supreme Court, but during the pendency of the appeal.    It is suggested in the appellant's brief that the judgment was affirmed on the 19th day of November, 1906, and reference is made to 203 U. S. 584, 27 Sup. Ct. 782, 51 L. Ed. ——, for a report of the decision.    We are able to find nothing in the record, however, to show that the decision of the United States Supreme Court was made until after the motion was submitted to the court below, and consequently the matter should be treated as a motion made pending the appeal in the United States Supreme Court, rather than after the decision of that appeal.    But, as will be shown later, it would have made no difference, so far as the jurisdiction of the City Court of the City of New York was concerned, whether the motion for a new trial had been made before or after the decision of the United States Supreme Court.

The appellant cites various decisions of the federal courts holding that there is no power in the courts below to grant a new trial after a decision of the case by the United States Supreme Court, such as In re Potts, 166 U. S. 263, 17 Sup. Ct. 520, 41 L. Ed. 994, and the cases there cited, American Soda Fountain Co. v. Sample, 136 Fed. 857, 70 C. C.

A. 415, and Dubuque & Pacific R. R. Co. v. Litchfield, 68 U. S. 69, 17 L. Ed. 514. In the recent decision of that court in Ex parte Fuller, 182 U. S. 562, 21 Sup. Ct. 871, 45 L. Ed. 1230, it was distinctly held, however, that in actions at law, as distinguished from actions in equity, the power of the court of original jurisdiction to grant a new trial on the ground of newly discovered evidence continued after the decision of the appeal by the Supreme Court. In that case the right to a new trial was secured and governed by certain statutory provisions in force in the territory in which the court of original jurisdiction sat, and the appellant insists that the existence or nonexistence of such statutory provisions is the test of the question, and that the respondent must fail unless it can point out some act expressly conferring upon the City Court of the City of New York the power to grant new trials upon the ground of newly discovered evidence. That such power has commonly been exercised by that court is well known. Such court, prior to the enactment of chapter 26, p. 20, of the Laws of 1883, was known as the "Marine Court of the City of New York," and until the passage of the act of 1880 (Laws 1880, p. 373, c. 245, § 1, par. 47), it was expressly authorized by chapter 799, p. 1817, of the Laws of 1871 to grant new trials on the ground of newly discovered evidence. In 1880 (Laws 1880, p. 1, c. 178) the act supplemental to the Code of Civil Procedure, consisting of chapters 14 to 22 inclusive, was enacted, which contains provisions making applicable to the Marine Court (section 3347) certain parts of the Code of Civil Procedure to which attention will presently be called. Prior to the adoption of the Codes, a motion for a new trial upon newly discovered evidence, in the Supreme and Circuit Courts, was authorized by section 1, c. 128, p. 188, of the Laws of 1832, which reads as follows:

"Where, in any personal action, any bill of exceptions shall be taken, demurrer to evidence put in, case made, or notice of motion given for new trial on newly discovered evidence, and the proceedings shall not be stayed, the party in whose favor the verdict is rendered, may perfect his judgment and issue execution; but it shall nevertheless be lawful for the other party to proceed to obtain a hearing before the Supreme Court upon the matters in question, in the manner hereinafter mentioned; and in case their judgment shall be in his favor, they may set aside the proceedings with the verdict, and order restitution, which may be enforced by such writs of restitution as are used in cases of reversal in error or by motion and attachment, according to the practice of the court in cases of attachment."

Such provisions were re-enacted in somewhat different language in section 265 of the Code of Civil Procedure, which has been superseded by sections 1002 and 1005 of the Code of Civil Procedure. Section 1002 provides:

"In a case not specified in the last three sections, a motion for a new trial must in the first instance be heard and decided at the Special Term. But where it is founded upon an allegation of error in a finding of fact or ruling upon the law, made by the judge upon the trial, it cannot be made unless notice therefor be given before the expiration of the time within which an appeal can be taken from the judgment, and it cannot be heard at a Special Term held by another judge; unless the judge who presided at the trial, is dead, or his term of office has expired, or he is disqualified for any reason, or he specifically directs the motion to be heard before another judge. And a trial by a referee cannot be reviewed by a motion for a new trial, founded upon such an allegation except in a case specified in the last section."

The three sections just referred to provide respectively (1) for motions for a new trial upon the judge's minutes made upon exceptions, or because the verdict is for excessive or insufficient damages or otherwise contrary to the evidence or to the law (section 999); (2) for a motion upon exceptions taken upon a jury trial and directed to be heard in the first instance by the Appellate Division (section 1000); and (3) for a motion made in the Appellate Division upon exceptions taken in an action tried by the court or a referee (section 1001). Section 1005 reads as follows:

"The entry of final judgment, and the subsequent proceedings to collect or otherwise enforce it, are not stayed by an exception, the preparation or settlement of a case, or a motion for a new trial, unless an order for such stay is procured and served; and the entry, collection, or other enforcement of a judgment does not prejudice a subsequent motion for a new trial. Where a new trial is granted, the court may direct and enforce restitution as where a judgment is reversed upon appeal."

With the adoption of the new Code, the Legislature swept away the act of 1832 by chapter 417, p. 468, of the Laws of 1877, and chapter 537, p. 720, of the Laws of 1881, and the act of 1871 by chapter 245, p. 373, § 1, par. 47, of the Laws of 1880, as above noted; and by section 3159 and subdivision 7 of section 3347 of the Code of Civil Procedure the provisions of sections 1002 and 1005 were made applicable to the Marine Court, which was afterwards changed to the City Court of the City of New York, as above stated. It will thus be seen by these various enactments that it was the intention that motions for a new trial upon the ground of newly discovered evidence should be governed by a single general provision, applicable alike to the Supreme Court, Marine Court (now the City Court of the City of New York), and County Court, instead of having separate provisions for each court.

A reading of the decisions of this state shows that the history of our law with relation to granting new trials is clearly traced back to its statutory origin in chapter 128 of the Laws of 1832. Among these may be cited Tracey v. Altmeyer, 46 N. Y. 598; Maloney v. Dows, 18 How. Pr. 27; Ralphaelsky v. Lynch, 12 Abb. Prac. (N. S.) 224; Luddington v. Miller, 36 N. Y. Super. Ct. 1, affirmed 53 N. Y. 643; Voisin v. Commercial Mutual Ins. Co., 56 Hun, 215, 9 N. Y. Supp. 267; affirmed 123 N. Y. 120, 25 N. E. 325, 9 L. R. A. 612; Holmes v. Roper, 10 N. Y. Supp. 284, 56 Hun, 645; Phelps v. Delmore, 4 Misc. Rep. 508, 26 N. Y. Supp. 278. The last three cases cited arose since the present Code went into effect, and the Court of Appeals, in Voisin v. Commercial Mutual Ins. Co., 123 N. Y. 120, 129, 25 N. E. 325, 9 L. R. A. 612, commenting upon section 1005 of the Code of Civil Procedure, said:

"A note to this section by the codifiers states that it had its origin in section 1 of the laws of 1832, and it may properly be considered a re-enactment of that section."

So, too, a note to section 1002 by the codifiers states:

"The first sentence is part of Code Civ. Proc. § 265. The remainder of the section is declaratory of the existing practice, as expounded in * * *, with the additional provision that exceptions, etc., cannot be heard, at Special

Term, by any judge except the one who presided at the trial. * * * In other respects this section follows the Code of Procedure, in not specifying the cases where a motion for a new trial may be made, or regulating the proceedings, where the motion is made upon other grounds than those expressly provided for. It has been often held that in all such cases the former practice is in force. See authorities collected and classified in Voorhies' Code (10th Ed.) pp. 392, 393; Marvin v. Marvin, 11 Abb. Pr. (N. S. No. 2) 102; Tracey v. Altmeyer, 46 N. Y. 598; Barrett v. Third Ave. R. R. Co., 45 N. Y. 628. A new trial on the ground of newly discovered evidence is within the first sentence of this section."

See Throop's Ann. Code 1891, p. 421.

It thus appears that the power to grant a new trial on the ground of newly discovered evidence is provided for and governed by statute, and consequently, if the power of the court below in this case to entertain and grant the motion is to be tested by the existence or nonexistence of statutory provisions on the subject, it must be held that such power exists. I do not, however, think that it was the intention of the United States Supreme Court in the case cited, namely, In re Fuller, 182 U. S. 562, 21 Sup. Ct. 871, 45 L. Ed. 1230, to base its decision upon such a narrow ground. The principle upon which the court proceeded, as I conceive it, is the familiar one that in actions at law the practice under the law of the various states will be recognized, whereas in actions in equity the federal courts have their own system of practice, which they adhere to, irrespective of the system of the state in which the action originates. On this theory the United States Supreme Court would recognize the power of the City Court of the City of New York to entertain and grant the motion under consideration. The action is one at law, and the power of the latter court in the premises is one dependent upon and governed by our statutes and methods of practice. In this connection it ought to be added that the pendency of an appeal in a higher court in this state, under our own decisions, would not have deprived the City Court of the City of New York of its jurisdiction to grant this motion; it being the law of this state that the pendency of an appeal is no bar to a motion for a new trial on the ground of newly discovered evidence. Henry v. Allen, 147 N. Y. 346, 41 N. E. 694. See, also, Smith v. Lidgerwood Manufacturing Co., 60 App. Div. 467, 69 N. Y. Supp. 975, Schmidt v. Cohn, 12 Daly, 134, and Vernier v. Knauth, 7 App. Div. 57, 39 N. Y. Supp. 784.

My conclusion is that the court below had power to entertain the motion, and that its discretion in granting the same was well exercised.

The order should therefore be affirmed, with $10 costs and disbursements.

GILDERSLEEVE, J., concurs.

ERLANGER, J. (dissenting). I am unable to subscribe to the conclusion reached by my associates, and I desire to record my dissent therefrom. Accepting the recognized legal postulate that new trials may be granted for newly discovered evidence, I hold they are to be granted with caution, and that a strong case must be made to persuade a court to exercise its discretion in that regard. If judgments

can be swept aside upon such a state of facts as the moving papers disclose, their finality is not only of doubtful validity, but their very integrity is threatened, and any judgment after a considerable lapse of time may be nullified despite the consequences which may result therefrom. Moreover, if the character of the proof submitted on this motion is to be deemed sufficient, it must fairly and logically be accepted in other cases, and we are thereby establishing, not alone a new rule, but a dangerous precedent. We may not depart from the well-established rules applicable to like motions, and we should therefore be slow in affirming an order that has in it such little merit as the one in hand.

The judgment in this case was rendered in February, 1905, after a fair trial. In May, 1905, it was affirmed by this court, and subsequently and on the 19th day of November, 1906, it was affirmed by the United States Supreme Court, to which it was carried by respondent. 203 U. S. 584, 27 Sup. Ct. 782, 51 L. Ed. ——. On December 28, 1906, nearly two years after its entry, the order appealed from was made, setting aside the judgment and granting a new trial. To support such an order it was necessary to present proof that would not only appeal to the conscience of the court, but at the same time carry with it the strongest conviction that injustice was done. And so, too, the record must fairly disclose facts which would lead to the conclusion that upon a new trial a different determination is reasonably certain. This, I repeat, was requisite before the court could be moved to set aside a solemn determination in favor of one of the parties to the judgment. A critical examination of the affidavits fails to disclose any of these things. With one exception they are all hearsay. All are barren of probative force, and, when compared with the record of the trial, there is not produced a circumstance strong enough to justify us in disturbing the judgment. A brief history of what occurred on the trial, and a reference to the complaint and the issue, are necessary in order to determine the effect of the moving affidavits.

And, first, as to the nature of the action: It was brought to recover $750 rent, claimed to be due for the month of January, 1905. It was alleged in the complaint on positive knowledge as follows: "That on or about the 1st day of May, 1902, plaintiff and defendant entered into a lease in writing whereby plaintiff leased and demised to" the defendant the premises therein referred to at a yearly rental of $9,000, payable in equal monthly payments in advance. In paragraph 4 it was further alleged, "upon information and belief, that on or about the 1st day of May, 1902, the defendant entered into possession and enjoyment of the premises demised in said lease." This complaint was verified by J. Crawford McCreery, the president of the plaintiff, on January 4, 1905. The answer admitted the execution of the lease on said day and the amount due, but denied the other allegations of the complaint. As a separate defense it charged that the defendant was not authorized to commence business under the national banking act until June 2, 1902, on which day it received a certificate from the Comptroller of the Currency allowing it to transact business; that the lease was executed prior to said date, and before the defend-

ant had any corporate existence, and hence was void and of no effect.
Here there was presented a well-defined issue; the vital question be-
ing the day on which the lease was executed. We start with a posi-
tive allegation in the complaint that it was executed on May 1, 1902,
and with the further averment, upon information and belief, that the
defendant entered into possession on said day. It is fair to assume
that, before the complaint was verified by plaintiff's president, he
was fully informed both with regard to the date of the execution of
the lease and the time possession was taken; for he expressly so
declared. Referring, now, to the stenographer's minutes upon the
trial, which are printed in the record, we find that the only question
litigated after the lease was admitted in evidence was the date of its
execution and delivery, and this was regarded as the crucial point by
the trial justice in determining the case. Mr. McCreery, the president
of the plaintiff, testified that in 1902 he was the vice president of the
company, and that the lease was delivered to him on June 19th; and
on cross-examination the following questions were asked and answers
given:

"Q. And that lease went into effect on May 1st? A. We were paid for May,
and we were paid for June. Q. 1902? A. Yes."

The plaintiff here rested its case, and the motion was then made to
dismiss the complaint upon the ground, among others, that, the lease
having been executed prior to June 2, 1902, it was void, and no re-
covery could be had under it. The court expressed a desire for ad-
ditional proof as to the delivery of the lease, and thereupon the de-
fendant called John W. Wooten, who testified:

That he was the attorney for the defendant in May and June, 1902. That
he was present when the lease was executed. That it was executed at the time
of the first meeting of the board of directors at the bank. "Q. That was May
27, 1902? A. I don't recollect the date. Q. Do you mean at the meeting at
which the officers of the bank were elected? A. Were elected. Q. You at-
tended that meeting? A. Yes. Q. Those are the official minutes of the bank?
"Plaintiff's Counsel: As I understand, this is only to refresh the witness.
"The Court: That is all.
"Q. The first minutes, previous to those I show you, were the stockhold-
ers' minutes. Those were the meetings of the directors, in which Van Cott
was elected president and Carraway secretary? A. May 2, 1902. Q. Were
you present when the lease was executed? A. I was. Q. And what did
you do with it, if anything, after it was executed? A. According to my
recollections the lease was on that day delivered to the McCreery Realty; on
that day. Q. By you? A. To Mr. Easter, representing the company."

The witness then declared that he recollects that the acknowledg-
ment was taken by Van Cott and Carraway some weeks after the
lease was delivered and executed. On cross-examination he stated:

That when he handed the paper to Mr. Easter he said, "There is the lease
duly executed." That he did not know at the time that the lease was not
acknowledged, but he knew that it was duly signed and sealed. That he had
both leases, that Easter took one and he took one, and that he handed it to
Carraway the cashier of the bank. "Q. Did you see it afterwards? A. Mr.
Carraway presented it to me one day, and said that Mr. Easter had been in,
and that the paper was not acknowledged, and that the company would not
accept it until it was properly acknowledged. Q. Do you know when that
was? A. I remember it was some time after the delivery. Q. Did you see it
after that? A. No."

Mr. Charles A. Hess, one of defendant's counsel, testified that he assisted in organizing the defendant bank; that he first saw the lease, Plaintiff's Exhibit A, about May 19, 1902; that he was present when it was executed; that certain insertions were in his and Wooten's handwriting; that the lease was signed May 27th, immediately after Mr. Van Cott and one Carraway were elected president and treasurer, respectively; that he was chairman of the meeting; that the lease had been knocking around for several days; that plaintiff was anxious to have it executed, and after it was executed it was given to Mr. Wooten for delivery to the plaintiff. The witness several times declared that it was executed and delivered on May 27th; that Mr. Easter, representing plaintiff, several times called with a view to having the lease acknowledged; that it was acknowledged on June 19th, and returned by him to Mr. Easter, the latter being in court at the time and identified by the witness.

Here the defendant rested, and renewed its motion to dismiss the complaint. Plaintiff's counsel, in opposing the motion, offered to show by plaintiff's president that he declined to accept the lease, and sent it back because it was not properly executed, and this request to permit additional evidence to be offered was allowed by the court. Whereupon Mr. McCreery was recalled, and he again said:

"I testified the lease sued on was delivered to me on the 19th or 20th of June, 1902."

And again:

"I received the lease supposed to be properly executed on June 19th."

On cross-examination there was produced a duplicate of the lease which plaintiff held, and he was questioned as follows in regard to it:

"Q. You mean you had the physical custody of that lease? A. Yes, of that paper, physical custody. Q. From the 27th of May until June 19th? A. I cannot say exactly from May 27th, but I presume I had it during that time. Q. You got it some time in May? A. Yes. Q. And you kept it until about the time it was acknowledged, June 19th? A. Yes. Q. That was the only copy you had? A. Yes. Q. That bears date when? A. That is the acknowledgment. Q. I ask you the date? A. June 27th it was acknowledged before a notary public."

At this point the attention of the witness was directed to the discrepancy between the lease (Plaintiff's Exhibit A) produced by the defendant and the one produced by the witness (Defendant's Exhibit 2), and the following questions were asked:

"Q. I now show you the copy which your lawyer handed to me, and you notice that it is signed 'Andrew B. McCreery' and appears to have been sworn to before Thomas W. Folsom, notary public, and the date appears to be the 27th of June, 1902? A. Yes. Q. And that the word 'June' is written over the word 'May,' 1902? A. Yes. Q. Now, can you refresh your recollection by looking at that acknowledgment—that date, May or June 27, 1902, whatever it is—and tell us from that date the exact date when you received that lease? A. My memory has been refreshed in respect to the date on which I had the lease delivered to me from the Equitable Bank, and that was on the 19th day of June. Q. That was the second delivery? A. The delivery of the paper evidently properly executed was on June 19th."

Asked again to reconcile the difference in the dates of acknowledgment, the witness said:

"I took note of the time when I received the delivery of the lease from the
bank, by making an entry in one of my private memorandum books belonging
to plaintiff."

The book was not produced by him, because he supposed his tes-
timony under oath would substantiate the date. Then he declared that
he did not personally speak to his attorney about the entry in the
book. In the next breath he admitted that he spoke to him "within
the last four months," and finally said he spoke to him about it within
the past week; that his attorney did not request him to produce the
book; that he inspected it within the last three days.

"The Court: But, independent of that, have you any recollection of that
date of the delivery of this executed lease? A. Probably I would not have
the precise date. It is several years ago, and I have a great many papers
pass through my hands. Q. When did you sign it? A. I presume that paper
was signed in June or May. I don't know what date."

From the testimony given at the trial it is readily seen that the
sole issue sharply contested was the date of the execution and de-
livery of the lease. This issue was submitted to the court by a re-
quest of each of the parties for a direction of a verdict. The court
held upon all the evidence that the lease was executed and delivered on
May 27, 1902, and rendered judgment for the defendant, which, as
we have seen, was affirmed both by this court and the Supreme Court
of the United States. That the lease was executed and delivered
on May 27, 1902, is to my mind clearly established. The fact that
the acknowledgment was subsequently added neither affected the
execution nor delivery of the instrument. There is no law in this
state requiring a lease to be acknowledged, and under the recording
acts the sole purpose is to give notice to subsequent purchasers. Ac-
knowledgments are frequently made after delivery as a matter of
convenience; but it is not to be claimed on that account that the
date of the acknowledgment is at all to control, where it varies from
the date of the instrument. People v. Snyder, 41 N. Y. 397–402;
Biglow v. Biglow, 39 App. Div. 103, 56 N. Y. Supp. 794.

A strong point in the case is found in the lease, which the defendant
succeeded in having plaintiff produce. A photographic copy of the
acknowledgment thereon is printed in the record, and it is glaringly
apparent upon a mere inspection that the word "June" is written over
the word "May" and that the form of acknowledgment bore the
original date of May 27th. Both of the witnesses, Wooten and Hess,
testified that the lease was executed and delivered on that day, and
here is a circumstance corroborative of their story. Plaintiff's coun-
sel was apparently entirely satisfied with what was developed upon the
trial. Mr. Easter, connected with the plaintiff, was in court and was
identified by Mr. Hess; but he was not called to contradict either the
evidence of that witness or of Mr. Wooten on the point of the re-
turn of the lease to him (Easter) on June 19th, long after its original
delivery. Mr. Easter, if called, could either have admitted the truth
of what Messrs. Wooten and Hess declared, or challenged their evi-
dence by a denial. Here was an accessible witness, connected with
the plaintiff, actually in court upon the trial, and yet not permitted
to testify. It is familiar law that the failure to call such a witness

·raises a presumption that his testimony would have been unfavorable, ·if called. At least the omission to place him on the stand is a strong ·circumstance to be considered in the case.

Next, an important memorandum book referred to in the moving ·papers, and claimed to have been several times before the trial mentioned to plaintiff's attorney, was not produced, though in the custody ·of plaintiff's president. If such a book containing such entry existed, it should have been produced for the purpose of refreshing the memory of the witness on the most important point in the case; and this is especially so as the witness, in answer to a question by the court, said, that independent of the entry, he could not give the precise ·date. "An original entry, or a memorandum made by a witness :at the time of a transaction, is admissible in evidence, as auxiliary to his testimony, only when, without its aid, he is unable to distinctly ·recollect the fact to which it relates." People v. McLaughlin, 150 N. Y. 365–392, 44 N. E. 1017. It is difficult to conceive why the date ·of the receipt of a lease should be entered by the president of a corporation in a private book of the company; but with that act we are not concerned, except in so far as it bears on the merits of the case. Six days after the trial plaintiff's counsel moved to amend the complaint to conform to the proof as of date June 19, 1902, which motion was granted; but the date of the execution and delivery of the lease was nevertheless decided by the court to be May 27, 1902.

So that, summarizing the result of the trial, we find plaintiff's president swearing to one date in the complaint and to other dates on the trial, all for the purpose of fixing liability on the defendant under the lease, and to overcome the defense that the lease was unenforceable :against it. It is clear to me that plaintiff was well aware of the fact that it was to meet the very issue which was contested, and that it knowingly went to trial upon that issue, omitting to call, not only Mr. Easter, but one James S. O'Neale, the assistant cashier of the defendant, who was apparently well known to Mr. Easter, and whose evidence, as appears from his affidavit read in opposition to the motion, ·could by the exercise of the slightest diligence have been procured at the trial. Mr. O'Neale made an affidavit for both parties. The one ·made on behalf of appellant shows his residence in this city for some years past, while the one made for respondent and relied on ·upon the motion purports to disclose evidence discovered since the trial and bearing on the date of the execution of the lease.

It remains now to examine the affidavits on which the motion for ·a new trial is founded. These, as already stated, are with one exception mere hearsay. They are not only devoid of proof, and entirely worthless for that reason, but their shallowness appears on a mere inspection of them. Six affidavits were read in support of the motion. Two were made by the president and treasurer of the plaintiff, respectively; one by its attorney, Mr. Kremer; another by a Mr. O'Neale, to whom we have already referred; and the other two by Wooten and one Gandy.

The affidavit of Mr. Kremer is important only in the following particulars: He avers that after the amended answer was served he made ·diligent inquiry to ascertain when the lease was executed; that he was

then informed that June 19th was the actual date of delivery; that for that purpose he examined plaintiff's officers and Mr. Easter, one of its employés, and learned that the date of delivery, as appears from its records, was June 19th; that prior to the trial he had an interview with the former attorney of the plaintiff, and ascertained that upon the trial the defendant intended to rely upon the date of the lease. The remainder of his affidavit is devoted to matters particularly mentioned in the affidavit of Mr. Gandy. Here we have an express admission of counsel as to what he did and learned before the trial. Mr. Easter, who is now conceded to have possessed knowledge, was in court at the time, but, as shown, was not called as a witness.

The affidavit of plaintiff's president states:

"That when he heard the testimony given at the trial by the defendant's attorney to the effect that the lease was actually signed on May 27, 1902, he was unable to contradict the same, or to form any opinion as to whether it was signed on said day, or prior or subsequent thereto, and that the first information he ever had as to its being signed on a different date was from his attorney after the 17th day of September, 1906," 19 months after the trial.

This is the same witness who at the trial testified to having made an entry of the date of the delivery of the lease in the private memorandum book of the plaintiff, and who verified the complaint, alleging of his own knowledge that it was executed on or about May 1, 1902.

The affidavit of plaintiff's treasurer shows that he has no recollection of the date of the delivery of the lease, and he further deposes that Andrew B. McCreery, the secretary of plaintiff, who is absent in Europe, informed him (affiant) that he had no recollection whatever concerning the lease or the date of its delivery.

The affidavit of Mr. Wooten requires little comment. He states, in effect, that the lease was executed and delivered after June 2, 1902, and not before; "that he did not intend upon the trial to give any testimony contrary to or inconsistent with the facts as stated; and that, if his testimony given upon said trial is contrary to or inconsistent with the facts as above stated, then such testimony was given under a misapprehension." He does not explain what the misapprehension was that led to his testimony as given by him upon the trial. He was called for one purpose, and that was to prove the date of the execution and delivery of the lease. Nor does he state how long after June 2d, or when, he now claims the instrument was executed and delivered. As the attorney for the defendant, and occupying to it a relation of trust and confidence, it is fair to assume that he was possessed of knowledge on the subject about which he testified, and it is also fair to assume that his recollection in February, 1905, of the particular event, was quite as clear as it was in October, 1906, when he made his present affidavit. Plaintiff asks that this witness be now permitted to change his evidence from the former trial to meet the particular date which has been so many times mentioned. To permit this to be done, in view of existing circumstances, is to invite perjury. If a new trial can be granted because a witness for the prevailing party has decided to come to the aid of a defeated party, by claiming that his evidence theretofore given was so given under a

misapprehension of the facts, we are approaching a perilous stage in judicial procedure. Not a single fact is stated that can carry with it conviction. He declares, further, that he handed the document to Easter after June 2d, and the reason he gives for remembering the fact now is because Easter frequently urged him to execute the lease. The final paragraph of Mr. Wooten's affidavit is interesting, and is as follows:

"Deponent further avers that said lease was not executed on the 27th day of May, 1902, because deponent verily believes that the name 'Equitable National Bank' was not authorized by the Comptroller of the Currency until June 1, 1902; that deponent will testify to the facts as above stated upon a new trial of this action."

The facility shown by Mr. Wooten to swear to various events is quite alarming. Upon a new trial he indicates a readiness to testify, among other things, that the bank was authorized to transact business on June 1st, when the Comptroller's certificate annexed to the record shows positively that the authority was not given until June 2, 1902.

Next we have the affidavit of Mr. O'Neale, to the effect that he was assistant cashier of the defendant; that after the defendant commenced business Mr. Easter several times inquired of him whether the lease had been signed; that on each of said occasions he mentioned the fact to Carraway, who stated to the affiant that the reason he delayed the matter was because he desired to secure the account of the plaintiff; that when Mr. Easter called the bank was conducting its business. This affidavit also discloses the fact that Mr. Easter possessed sufficient knowledge at the time of the trial to have rendered it important to call him.

Lastly, we have the affidavit of Mr. Gandy. It is this affidavit upon which plaintiff stakes its all for a new trial. But, if one reads it, the first question that suggests itself is "Who is Gandy?" How does he appear in the case, and who discovered him? His appearance is wholly unaccounted for, except upon the theory of a mere inspiration. He seems to be unknown to any one connected with the plaintiff or its attorney, and the defendant disclaims all knowledge of him. A quotation from his affidavit will best illustrate an anomalous situation. He asserts that he has known Carraway for four years, and that at the time of the trial Carraway was in the state of Mississippi. Then he says:

"In June or July, 1905, I had a conversation with said Carraway, in which the facts in the above-entitled case were discussed, and in the course of which said Carraway stated to me that the lease mentioned in the complaint herein of the premises occupied by the defendant bank, on Broadway, near Eleventh street, were signed by C. Van Cott, then president, and by said Carraway, as cashier, after June 2, 1902, and not before."

What called forth this conversation is not given. Why the affiant interested himself in this matter does not appear. Without ryhme or reason a conversation was had in which it is claimed an important admission was obtained. Now see what follows: In July, 1906, he saw Carraway again, and was informed by him that one Cunningham the day before had expressed the desire of an interview with him, but the privilege was denied, because he (Carraway) "feared that he

might be served with a subpœna to appear as a witness upon some proceeding connected with this action, and that he did not desire to give testimony, inasmuch as his testimony would be adverse to the defendant, and hence adverse to his own interests as a stockholder of the defendant." The affiant failed to state in what proceeding Carraway could have been called by a subpœna, and it nowhere appears that any was pending. If this is regarded as a credible statement, or even if it can be considered as a sufficient story to move the court to aid a lost cause, there is, indeed, hope for future defeated litigants. It served, of course, as a means to an end. It was apparently hoped that its plausibility would give effectiveness to all that was contained in the affidavit of Mr. Gandy, and it was a mere introduction of what was to follow. What does follow is to the effect that Carraway admitted to affiant that the lease was executed after June 2, 1902. The affidavit then recites that on September 1, 1906, for the first time the facts were related by affiant to plaintiff's attorney, and the latter suggested that an affidavit be obtained from Carraway. Thereupon letters and telegrams are alleged to have passed between the affiant and Carraway; the first letter, dated September 10th, being as follows:

"You can say I will give them my deposition, so they can open the case, and that same will be substantiated by another witness, who knew that the lease was not signed until after the bank had been running for several weeks. I am getting very busy, and would rather not leave here just now."

Who the other witness is, and his name and address, are mysteriously withheld. Then it appears that on September 17, 1906, a telegram was received by the affiant, and, to use his own words:

"Which telegram is signed 'John Carraway,' and reads as follows: 'I signed my name to lease McCreery to Equitable Bank after June 2, 1902, and will make affidavit to that effect.' "

The affidavit next says that:

"Since September 17th, however, said Carraway has refused to furnish an affidavit for use upon the motion herein, for the reason that he is unwilling to volunteer testimony in this case adverse to his own interest as a stockholder of the defendant and the interests of his friends similarly situated."

Then follows this somewhat remarkable statement:

"I am entirely confident, from my knowledge of said Carraway's personal character and from my conversations and correspondence with him, that if his attendance upon the trial should be compelled by subpœna, or his testimony taken under commission for that purpose, he would testify to the facts as hereinabove stated. Said Carraway is engaged in business in Biloxi, in the state of Mississippi, where he resides with his family, and I am and have at all times been cognizant of his whereabouts, and therefore believe that, if his personal presence at the trial of this action cannot be obtained, the plaintiff can readily obtain his testimony in the state of Mississippi by means of a commission issued for that purpose."

It is self-evident that Mr. Carraway's presence in Mississippi will make it quite difficult to procure his attendance by subpœna upon the trial. Nor is the belief of affiant that the evidence can be obtained by commission justified by his narrative. Nowhere is it stated what the testimony of the new witness will be, except as may be inferred from an alleged conversation. The reason given by Mr. Carraway for his refusal to furnish his affidavit to plaintiff lacks candor to say the

least; for it is claimed that he has voluntarily offered to testify either upon the trial or by commission, yet he expressed reluctance to sacrifice himself and friends by affidavit. There is nothing in Mr. Gandy's affidavit that justifies either judicial notice or action. Nor am I able to discover how it is possible to torture anything deposed to by him into newly discovered evidence within the meaning of the authorities. There is nothing to show that Mr. Carraway will either appear on the trial or give his evidence upon commission. If he was honest in his reason for refusing his affidavit, it is fair to assume that he will be quite as unwilling to give evidence upon a new trial adverse to himself and friends.

The affidavit of Mr. Hess in opposition contains matters to which some reference must be made. From it the fact appears that the lease was executed and delivered on May 27th, and the reasons given by him carry with it conviction of truth. From it, too, there is shown that in January, 1905, a month before the trial of this action, Carraway was indicted by a United States grand jury for a violation of the banking laws in having certified certain checks in violation of law; that shortly thereafter said Carraway was arrested in Biloxi and gave bond for his appearance; that in March, 1906, he entered a plea of guilty, and at the request of the officers of the defendant and of Mr. Hess Mr. Justice Thomas suspended sentence. It is argued by respondent that the sentence was suspended because overcertification of checks was a matter of common occurrence among cashiers. I can find nothing in the record to justify such conclusion. It may as well be inferred that sentence was suspended because Carraway was deemed an important witness for the government on the trial of O'Neale who, as I will presently show, was also indicted for offenses against the banking law. That Congress did not consider overcertification a trivial offense is quite evident from the maximum punishment which may be inflicted, namely, imprisonment for five years and a fine of $5,000. Act July 12, 1882, c. 290, § 13, 22 Stat. 166, amending section 5208, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3497].

Mr. O'Neale, above referred to, is the other affiant, and he was indicted by the United States grand jury for making a false report to the Comptroller of the Currency, which indictment is still pending and upon which he is awaiting trial. Mr. Wooten, since the trial of this action, was indicted for a felony, and is now serving a sentence in state's prison. None of these facts are denied. Ought we not to consider the reputation of these witnesses on the present application? It seems to me that we should. In the case of Hagen v. N. Y. C. & H. R. R. Co., 100 App. Div. 218–221, 91 N. Y. Supp. 914, the identical question was passed upon on a similar application. One of the new witnesses was twice convicted for an assault, and once for disorderly conduct, and another witness was convicted of public intoxication. Upon the affidavits of these two witnesses a motion for a new trial was made, and Judge Spring said:

"The suggestion is a cogent one that witnesses of this kind would not aid the plaintiff in securing a different verdict from the one last rendered. The fact that the application is founded upon the affidavits of men of unsavory

reputation casts suspicion upon it, and induced the belief that it is without real merit."

Here the three witnesses upon whom plaintiff solely relies to obtain a new trial are not only charged with crime, but one is actually confined in a penal institution, another was convicted, and the third is under indictment. We should be slow in accepting the statements of such witnesses, even though no other reason existed for denying this application.

The affidavit of Mr. Miskimon, read in opposition to the motion, to the effect that plaintiff opened an account with the defendant on the 5th day of August, 1902, by depositing the sum of $2,234.10, challenges the probable truth of the statement alleged to have been made to Gandy by Carraway that the reason why he (Carraway) remembers that the lease was executed after June 2, 1902, was because he deferred that matter until he could procure such account, and no one claims that the lease was delivered as late as August, 1902.

Finally, the replying affidavit of Mr. Easter, wherein he states that, although he attended the trial and was asked at the time by Mr. Kremer, the counsel for the plaintiff, what he knew about the delivery of the lease, and that he "tried to recollect, and was unable to recall any of the circumstances testified to by the witnesses on the trial, and was unable to contradict or confirm any of their statements," requires no further comment than to say that, after talking with Gandy and O'Neale, he has so far refreshed his memory that he is now willing to swear positively "that the lease was not handed to him on May 27, 1902, or on any day prior to June 2, 1902."

New trials have been granted where it was made to appear that perjury was committed by witnesses on the side that has prevailed. But I know of no reason why a new trial should be granted for newly discovered evidence, in order to permit one of the witnesses to change his evidence, and to give to the others an opportunity to corroborate him. A new light has suddenly been revealed to them, and all are now eager to sacrifice themselves in behalf of plaintiff; but I am unwilling to permit them so to do at the expense of their consciences. I confidently assert that, in all the cases where new trials have been granted for subsequently discovered proof, none is to be found where a state of facts exist parallel to the present one. In all the cases cited in the prevailing opinion, just grounds for setting aside the judgments existed; but none fit this case. While the power to set aside a judgment in a proper case should at all times be exercised in furtherance of justice, before such power is exerted a clear and convincing case should be made, so that it can be seen that a wrong has been done. This is not the case here. Parties are not to be deprived of the fruits of their victory after the lapse of two years by any such plea as is made out here, nor are judgments to be nullified for mere experimental purposes. From all the so-called evidence disclosed, it is extremely doubtful that the result can be changed; and, while this may be a matter for a jury, the court in the first instance is the judge of such evidence, and it is clear to my mind that the proof sought to be introduced upon a new trial is neither certain nor probable to change the result. Proper diligence on the part of plaintiff's counsel would

have enabled him to produce at least some of the witnesses on the former trial, and his own affidavit shows that, instead of using diligence, there was an entire absence of it.

It was urged upon us by respondent that upon the granting of a new trial its right to recover $20,000 depends. The record shows that but $750 is involved; but I do not see why we should be at all influenced by any consideration in respect of future accruing rent, especially where plaintiff has had its day in court, and after a fair trial, in which full justice was done, was defeated upon every point litigated.

A more serious question is raised by appellant, and it is contended by it that, while the City Court is fully invested with discretionary power to grant a new trial in a proper case for newly discovered evidence, it could not under the case of Ex parte Fuller, 182 U. S. 562, 21 Sup. Ct. 871, 45 L. Ed. 1230, and kindred cases, set aside the judgment in this case, after it was affirmed by the Supreme Court of the United States, unless there is found in this state an express statute which confers such right. Without conceding that there is such a statute, I do not deem it necessary to pass upon the question, in view of the conclusion reached by me that the affidavits upon which the motion is predicated are wholly insufficient.

The principle involved on this appeal is deemed by me of sufficient importance to require its submission to the Appellate Division, and leave should be granted to appellant to appeal thereto.

The order should be reversed, with costs and disbursements.